UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS CRENSHAW,<br><br>            Plaintiff,<br><br>      v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>            Defendant. | No.  2:12-cv-0097-AC<br><br><br><br>ORDER |

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act").  The parties' cross-motions for summary judgment are pending.  For the reasons discussed below, the court will deny plaintiff's motion for summary judgment and will grant defendant's motion for summary judgment.

PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on February 19, 2008, alleging disability beginning July 1, 2007.  Administrative Record ("AR") 85-88.  Plaintiff's application was initially denied on April 7, 2008, and again upon reconsideration on October 8, 2008.  AR 89-92, 96-97, 100-04. On March 4, 2010, a hearing was held before administrative law judge ("ALJ") Robert Tronvig, Jr.  AR 36-72.  Plaintiff appeared at the hearing with attorney representation.  In a decision dated

1

May 21, 2010, the ALJ determined that plaintiff was not disabled under 1614(a)(3)(A) of the Act.[1]  AR 80-86. The ALJ made the following findings (citations to 20 C.F.R. omitted):

> 1. The claimant has not engaged in substantial gainful activity since February 19, 2008, the application date.
>
> 2. The claimant has the following severe impairments: status post bilateral inguinal hernia surgery and degenerative disc disease of the lumbar spine.
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
>
> 4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four:  Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five:  Does the claimant have the residual functional capacity perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

perform the full range of medium work as defined in 20 CFR 416.967(c).

5. The claimant is capable of performing past relevant work as a truck driver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

6. The claimant has not been under a disability, as defined in the Social Security Act, since February 19, 2008, the date the application was filed.

AR 20-31. The Appeals Council affirmed the ALJ's decision on March 10, 2010. AR 1-4.

## STATEMENT OF THE FACTS

Born on September 26, 1961, plaintiff was 45 years old on the alleged onset date of disability, see AR 157, and 48 years old at the time of the administrative hearing, AR 39. Plaintiff completed special education classes up through the tenth grade, though he has limited ability to read and write. AR 42-44. He last worked in 2007 as a truck driver. Id. 45. Plaintiff alleges disability beginning on July 1, 2007 related to a back injury. AR 20, 81, 93. At the hearing before the ALJ, plaintiff clarified that he no longer has any physical limitations and is instead relying on mental health issues. AR 41. Per plaintiff, these mental health issues stem from the January 2008 death of his four-year old daughter while in foster care. See AR 22. Plaintiff contends that the circumstances of her death are suspicious. See AR 44-45.

## LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. See Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "It means such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

N.L.R.B., 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

## ANALYSIS

Plaintiff argues that the ALJ erred by (a) finding that there was no severe mental impairments at step two of the sequential process, and (b) rejecting the opinions of treating doctors and giving undue weight to the opinions of the examining and non-examining experts. Alternatively, plaintiff asks the court to remand because the Appeals Council erred in not remanding this case to the ALJ upon receipt of new evidence.

The ALJ found at step two that plaintiff did not have any severe mental impairments. AR 22-28. Plaintiff argues that this was in error because the ALJ failed to properly evaluate the severity of his mental impairments.

"The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). The purpose is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 153 (1987). At step two of the sequential evaluation, the ALJ determines which of claimant's alleged impairments are "severe" within the meaning of 20 C.F.R. § 404.1520(c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96–3p (1996)). The step two severity determination is "merely a threshold determination of whether the claimant is able to perform his past work. Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability." Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007).

At the second step, plaintiff has the burden of providing medical evidence of signs,

1  symptoms, and laboratory findings that show that his or her impairments are severe and are

2  expected to last for a continuous period of twelve months.  Ukolov v. Barnhart, 420 F.3d 1002,

3  1004-05 (9th Cir. 2005); see also 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909,

4  416.920(a)(4)(ii).  An ALJ's finding that a claimant is not disabled at step two will be upheld

5  where "there are no medical signs or laboratory findings to substantiate the existence of medically

6  determinable physical or mental impairment."  Ukolov, 420 F.3d at 1005.

7      Pursuant to the analytical procedure prescribed by the regulations, after the ALJ

8  determines that the claimant has a medically determinable mental impairment, he then rates the

9  degree of the claimant's functional limitations in four areas, known as the "B Criteria": (1)

10 activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4)

11 episodes of decompensation.  20 C.F.R. § 1520a(b)-(c); see also Pt. 404, Subpt. P, App. 1, 12.00

12 Mental Disorders.  In the first three areas, the ALJ rates the limitations as either none, mild,

13 moderate, marked, or extreme.  The fourth functional area, episodes of decompensation, is rated

14 on a four point scale of none, one or two, three, and four or more.  20 C.F.R. 404.1520a(c)(3) and

15 (4)).  If a severe impairment exists, all medically determinable impairments must be considered in

16 the remaining steps of the sequential analysis.  20 C.F.R. § 404.1523.  The ALJ "must consider

17 the combined effect of all of the claimant's impairments on her ability to function, without regard

18 to whether each alone [i]s sufficiently severe."  Smolen, 80 F.3d at 1290; 20 C.F.R. § 404.1523.

19     The ALJ followed this analytical procedure in this case and determined that plaintiff's

20 mental impairments were not severe, specifically finding that plaintiff had no restrictions in the

21 first two functional areas (activities of daily living and social functioning), mild limitations in the

22 third functional area (concentration, persistence or pace), and, as to the fourth functional area, no

23 episodes of decompensation.  AR 23-24.  Substantial evidence supports the ALJ's conclusions.

24 First, with regard to daily activities, plaintiff completed a function report questionnaire in which

25 he noted that he has no problem with personal care (dressing, bathing, shaving, etc.), is able to

26 walk, drive a car, shop for groceries, and pay bills.  AR 195-202, 203-05.  See also AR 329-446

27 (medical records often describing plaintiff as "well-groomed," "fair hygiene," and "neatly

28 dressed").  He also testified that he washes dishes, prepares his own food, does his laundry, and

5

helps with the housecleaning. AR 41, 54-55. As to social functioning, plaintiff's testimony and the medical notes provide that plaintiff enjoys fishing with friends once a week, that he continues to visit with friends regularly, and that he stays in regular touch with his stepchildren. AR 56, 309, 330-34; see also id. 207. Next, with regard to concentration, persistence or pace, the ALJ noted that plaintiff went only as far as the 10th grade and was primarily enrolled in special education classes. AR 24. Yet despite plaintiff's claims that he cannot write or comprehend due to learning disabilities, he seemed to function well enough to complete a questionnaire at a psychiatric evaluation, see AR 195-202, 273; he had a good work record and earnings at substantial gainful activity levels as a trucker, id. 64-67; was able to check out books from the library and read, pay bills, count change, get himself to appointments, and use public transportation. AR 195-202, 203-10, 305-22, 329-44. Additionally, Dr. Gouhua Xia, plaintiff's treating psychiatrist, noted that plaintiff's cognitive function was "grossly normal." AR 307. Finally, as to periods of decompensation, the ALJ found that plaintiff has experienced no period of decompensation that have been of extended duration. AR 24. There is no evidence of increased symptoms requiring hospitalization, emergency treatment, or intensive psychiatric care.

        1.       <u>Medical Records Produced to ALJ</u>

In addition to the foregoing, the ALJ also based his decision on the "minimal record of treatment, February 23, 2009 through November 17, 2009," showing that plaintiff's mental impairments caused no more than minimal limitation on plaintiff's ability to perform basic mental work activities. AR 23.

            a.       <u>Records from Treating Sources</u>

The ALJ first looked at the records of plaintiff's treating sources. Dr. Xia of the Sacramento County Adult Psychiatric Support Services ("APSS") met with plaintiff every two to three months from February 2009 to November 2009. See AR 305-08, 310, 312, 332, 340. At these evaluations, plaintiff claimed that he had been depressed his whole life but had "dealt with it by himself." AR 305. He also stated that, after the death of his daughter, he lost focus, sleep was difficult for him, and his energy level was low. AR 305. Plaintiff was taking Prozac, which was noted to be working well on his mood and helping to reduce his anger. See, e.g., AR 312,

6

332. Plaintiff also regularly admitted to using marijuana in combination with the Prozac and was regularly noted to take his Prozac only intermittently. See, e.g., 310, 312. Dr. Xia described plaintiff as a "calm" well groomed man with normal speech, with an active and congruent affect, and with grossly normal cognition, though he also described plaintiff as "angry with an attitude." AR 310, 332. Notably, Dr. Xia never diagnosed plaintiff with depression. Instead, his consistent diagnosis was "Mood d/o NOS r/o Mood D/O due to GMC or medication, abnormal grieving, dysthymia, bipolar; and factitious/malingering d/o." See AR 310, 312, 332, 340, .

During this period and on referral from Dr. Xia, plaintiff was seen regularly by Marcy Vayder, a mental health counselor with APSS, for individual therapy sessions. See AR 309, 314, 317, 333, 334-35, 337. During these sessions, plaintiff noted that he has been depressed off and on four years ago due to his learning disability and that he had been depressed his whole life but he has dealt with it by himself. See AR 305. He often discussed feelings of grief and depression regarding his daughter's death. Ms. Vayder and plaintiff discussed ways in which he could cope with these feelings, including deep breathing, fishing, spending time with family and friends, and reading books that he gets from the library. Ms. Vayder regularly praised plaintiff for demonstrating good impulse control. Ms. Vayder's notes from the month of October 2009 reference plaintiff's problems in securing housing, but it appears this issue was ultimately resolved.

On November 9, 2009, plaintiff met with a new therapist, Tressa Murai, following Ms. Vayder's departure from the clinic. AR 331; see also id. 333. With Ms. Murai, plaintiff discussed the details of his daughter's death, which continued to elicit feelings of anger, disbelief, and overwhelming grief. Plaintiff also discussed family members and friends with whom he enjoys spending time and with whom stays in contact. Plaintiff then stated that he was living in his car and found it difficult to be around people because of "the 'paranoia' and irritability." Ms. Murai described plaintiff as orientated with a sad and tearful affect, dysphonic, and with a linear and logical thought flow.

On September 14, 2009, Ms. Murai and Dr. Xia[2] completed a Medical Source Statement regarding plaintiff's mental health. AR 345-46. Plaintiff's ability to understand and remember instructions was noted to be poor. He was described as "distracted and has difficulty following instructions." His memory was also noted to be poor and he was said to have great difficulty tracking information. Plaintiff's ability for sustained concentration and task persistence alternated between fair and poor, with the notes indicating that plaintiff is able to understand some instructions but has difficulty following through with tasks. His ability to interact with the public was described as poor, as was his ability to adapt. The notes indicate that plaintiff has great difficulty in social settings, which increase his anxiety, and that his "severe depression" prevents him from keeping a job or living in a shelter.

The ALJ rejected this opinion as unsupported by the record. AR 26. "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). "If a treating physician's opinion is well-supported . . . and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. Even if a treating physician's opinion is not given controlling weight, the opinion is still entitled to deference and the ALJ must consider specific factors in determining the weight it will be given, including (1) the length of the treatment relationship and the frequency of examination and (2) the nature and extent of the treatment relationship. Id. Additional factors relevant in evaluating the weight of any medical opinion, not just treating physician opinions, include: (3) the amount of relevant evidence that supports the opinion and the quality of the explanation provided, (4) the consistency of the medical opinion with the record as a whole, (5) the specialty of the physician providing the opinion, and (6) other factors such as the degree of understanding a physician has of Social Security disability programs and their evidentiary requirements and the physician's familiarity with other information in the record. Id.

If a treating physician's opinion is not contradicted by another doctor, it may only be

---

[2] Both signatures appear on this document, but the notes appear to be in Ms. Murai's handwriting.

rejected for clear and convincing reasons supported by substantial evidence. Orn, 495 F.3d at 632 (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if the treating physician's opinion is contradicted by another doctor, it may not be rejected unless the ALJ provides specific and legitimate reasons supported by substantial evidence. Id. (quoting Reddick, 157 F.3d at 725).

Here, the ALJ found that neither the treating records of Ms. Murai (who, based on the medical records before the ALJ, treated plaintiff only once before writing the assessment and was therefore presumably relying primarily on Ms. Vayder's treatment notes) nor Dr. Xia supported the limitations set forth in the Medical Source Statement. For example, the conclusion that plaintiff has great difficulty in social settings and that his "severe depression" prevents him from keeping a job or living in a shelter is contradicted by both Dr. Xia and Ms. Vayder's own treatment notes, as well as plaintiff's testimony at the hearing, that plaintiff interacts regularly with family and friends through personal visits, fishing trips, and telephone calls. Additionally, the notation that plaintiff is unable to keep a job because of his depression is negated by the fact that plaintiff did keep a job for two years before he hurt his back, which coincides with the time period when plaintiff claimed he was depressed off and on. See AR 305. Furthermore, while there is evidence in the record that plaintiff experienced some difficulty in finding housing, this was deemed insufficient to conclude that plaintiff "has difficulty following instructions, has great difficulty tracking information, has difficulty with focus, poor memory, even sometimes forgets what he is talking about in the middle of a thought." Thus, the ALJ gave little weight to the opinion of Dr. Xia, which he found to be merely a "sign off" of Ms. Murai's findings.

Furthermore, Ms. Murai's opinion, standing alone, can be accorded no weight since licensed clinical social workers, therapists, public and private social welfare agency personnel, and rehabilitation counselors are not acceptable medical sources. SSR 06–03p; see also 20 C.F.R. § 416.913(d). The undersigned therefore finds the ALJ's rejection of Dr. Xia's opinion to be supported by clear and convincing reasons supported by substantial evidence.

Plaintiff argues that the rejection of the limitations set forth in the Medical Source Statement was erroneous because the ALJ ignored the reality of mental health treatment of indigent persons by public health agencies such as APSS, where the health care professionals

9

work as a team.

In Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996), the Ninth Circuit upheld an ALJ's decision according greater weight to the opinion of a nurse practitioner who worked closely under the supervision of a licensed physician, consulted with the physician "numerous times" about the claimant's treatment, and acted as an "agent" of the physician in her relationship with the claimant. The Ninth Circuit held that because the nurse practitioner was an "agent" of the physician, "her opinion was properly considered as part of the opinion of [the physician], an acceptable medical source." Gomez, 74 F.3d at 971. In reaching this conclusion, the Ninth Circuit relied on 20 C.F.R. § 416.913(a)(6), which stated, "[a] report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." Id.

In 2000, the Social Security Administration deleted 20 C.F.R. § 416.913(a)(6) as "redundant and somewhat misleading." 65 Fed. Reg. 34950–01, 34952 (July 3, 2000). The SSA clarified that acceptable medical sources are individuals, and the inclusion of an acceptable medical source's evaluation in an interdisciplinary report does not transform the report into an acceptable medical source. Id.

The Ninth Circuit has not explicitly addressed the impact of the repeal of § 416.913(a)(6) on Gomez. The court has, however, continued to cite to Gomez and apply its rule as a narrow exception to the "acceptable medical sources" definition contained in the regulations. See, e.g., Taylor, 659 F.3d at 1234 ("To the extent [the] nurse practitioner was working closely with, and under the supervision of [the physician] her opinion is to be considered that of an acceptable medical source."); Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (declining to address Gomez's continued applicability but affirming the ALJ's decision not to consider the opinion of a physician's assistant as an acceptable medical source because "the record [did] not show that she worked under a physician's close supervision").

Most district courts have interpreted the revision to § 416.913 as underscoring the narrow scope of the exception recognized by the Ninth Circuit in Gomez. See, e.g., Davis v. Astrue, 11-cv-1819 PJH, 2012 WL 3011223, at *16 (N.D. Cal. July 23, 2012) ("Gomez does not stand for

10

1  the proposition that any medical professional, who would not otherwise be considered an
2  "acceptable medical source," is transformed into an "acceptable medical source" merely because
3  he or she is supervised to any degree by a physician."); Garcia v. Astrue, No. 10-cv-0542 SKO,
4  2011 WL 3875483, at *13 (E.D. Cal. Sept. 1, 2011) ("Only in circumstances that indicate an
5  agency relationship or close supervision by an 'acceptable medical source' will evidence from an
6  'other source' be ascribed to the supervising acceptable medical source."); Ramirez v. Astrue,
7  803 F. Supp. 2d 1075, 1082 (C.D. Cal. 2011) (physician's signature on client plan prepared by a
8  social worker did not establish that the social worker worked under the physician's close
9  supervision while treating claimant or preparing reports, and therefore social worker was not an
10  acceptable medical source); Vasquez v. Astrue, 08-cv-0078 CI, 2009 WL 939339, at *6 n.3 (E.D.
11  Wash. Apr. 3, 2009) (affirming ALJ's determination that physician's assistant was not part of an
12  interdisciplinary team and thus an acceptable medical source where there was no evidence that
13  the signature or initial on the physician's assistant's report was made by a physician).

14  Here, the record does not establish that either Ms. Vayder or Ms. Murai was an agent of
15  Dr. Xia as described in Gomez. The records from APSS do not establish that a close supervisory
16  or agency relationship existed between Ms. Vayder and Ms. Murai and Dr. Xia, and there are no
17  notes indicating that these individuals met with Dr. Xia to discuss, let alone plan, plaintiff's
18  mental health treatment. But even if Dr. Xia's signature indicated that Ms. Murai acted as Dr.
19  Xia's agent and therefore the limitations set forth in the Medical Source Statement could be
20  considered as from an acceptable medical source, the Commissioner properly weighed and
21  discounted the opinion in the report, for the reasons discussed above.

22        b.     Records from Examining Sources

23  The ALJ also considered and rejected the opinion of examining psychiatrist, Dr. Shohreh
24  Ghaemian. As with a treating physician, there must be clear and convincing reasons for rejecting
25  the uncontradicted opinion of an examining physician, and specific and legitimate reasons,
26  supported by substantial evidence in the record, for rejecting an examining physician's
27  contradicted opinion. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).
28  On September 13, 2008, plaintiff underwent a comprehensive psychiatric evaluation by

11

1  Dr. Ghaemian.  AR 273-77.  Dr. Ghaemian did not receive any prior psychiatric or medical
2  reports prior to the evaluation.  Id. 273.  At the evaluation, plaintiff's complained chiefly of anger
3  and stated that he does not know what his mental illness is because he is able to "deal with it."  Id.
4  He told Dr. Ghaemian that he was unable to sleep, his appetite was low (eating only once a day),
5  he had no energy, he had no friends, and he did not socialize.  Id. 274, 276.  He reported mood
6  swings and claimed that he sometimes saw a shadow that he thinks is his daughter watching over
7  him.  Id. 274.  Dr. Ghaemian noted that plaintiff "had a negative attitude" and that his behavior
8  was "minimally cooperative."  Id. 275.  His thought process was noted to be "tight and logical"
9  and his affect was described as "natural."  Id.

10  Dr. Ghaemian diagnosed plaintiff as follows: Axis I, malingering and polysubstance
11  dependence, rule out impulse control disorder, and Axis II, antisocial personality traits.  AR 276.
12  Dr. Ghaemian noted that a few factors led to a diagnosis of malingering, including that plaintiff
13  reported a history of anger problems but admitting that he had never been violent.  Id.
14  Additionally, he claimed that he does not have any education and is not able to write, but he filled
15  out the questionnaire by himself.  Id.  His attempt to spell the word "world" forward and
16  backward also appeared to be intentionally misrepresented, and he was able to promptly calculate
17  $5 \times 8 = 40$.  Id. 276-77.  Moreover, Dr. Ghaemian noted that plaintiff did not present as an
18  insomniac or without rest or as one who eats rarely, as he was well-built and athletic and
19  appeared well-rested.  Id. 275, 277.  She also noted that plaintiff did not present as severely
20  depressed.  Id. 277.  She noted that "malingering should definitely be considered," but she
21  recommended that a neuropsychological exam be ordered to rule it out.  Id.

22  Dr. Ghaemian then set forth the following functional assessment: plaintiff is capable of
23  performing simple and repetitive job on a regular basis; his ability to perform detailed and
24  complex tasks is limited due to his lack of educational background and employment history; his
25  ability to interact with colleagues and society may be jeopardized by his irritability and anger
26  issues; and his ability to respond to changes in a work-like environment and make appropriate and
27  sound decisions appears to be fairly impaired.  AR 277.

28  The ALJ gave little weight to Dr. Ghaemian's functional assessment regarding plaintiff's

1 ability to perform simple, repetitive tasks and the limitations on his ability to perform detailed and
2 complex tasks.  The ALJ's decision was based on the record, which reflected that, despite
3 plaintiff's claim that he had been depressed his entire life and despite his limited education, he
4 was able to maintain a well-paying job as a truck driver for two years before injuring his back.
5 Furthermore, the Dictionary of Occupational Titles gives a specific vocational preparation level
6 of 3-5 (semi-skilled to skilled work) for a truck driver, undermining Dr. Ghaemian's assessment
7 that plaintiff is limited to simple, repetitive tasks.

8 　　　　The ALJ also relied on the evidence in the record that plaintiff has been malingering.  This
9 included medical notes dated September 9, 2008 from an orthopedic evaluation performed by Dr.
10 Fariba Vesali: "The claimant was walking with a normal gait outside the room and was standing
11 with no difficulty.  When I asked him to walk inside the exam room, he showed a tremendous
12 amount of difficulty."  AR 269.  Dr. Ghaemian's own notes indicate malingering: "He was
13 walking originally with his some [sic] limitation and difficulty, although while he was walking
14 out of the room he appeared to be able to move more frequently and freely. . . . He raised his
15 voice on a few occasions, which appeared to be intentional and to channelize the direction of the
16 interview."  AR 273.  Plaintiff "raised his voice a few times; this appeared to be mostly
17 intentional to draw attention to his anger issues."  Id. 275.

18 　　　　Plaintiff contends that the ALJ unduly relied on the opinions of Dr. Vesali and Dr.
19 Ghaemian that he was malingering.  He argues that because neither of these doctors reviewed
20 plaintiff's medical records before examination, their opinions do not constitute substantial
21 evidence to support rejection of the treating physicians' opinions.  Plaintiff is correct that
22 examining physicians must be provided with a claimant's medical record prior to examination.
23 See 20 C.F.R. § 416.917 ("If we arrange for [a consultative] examination or test, . . . [w]e will
24 also give the examiner any necessary background information about your condition.").  This
25 language does not require, however, that the report of an examining physician who is not
26 provided with all of a claimant's medical records is fatally flawed and must be disregarded
27 entirely.  In determining the weight to be given to a physician's opinion, the ALJ is instructed to
28 consider factors including "the extent to which an acceptable medical source is familiar with the

1   other information in [the] case record." 20 C.F.R. § 416.927(c)(6).  In this case, Dr. Vesali's
2   report indicates at the time of the examination she was not provided plaintiff's medical records.
3   AR 266.  However, Dr. Vesali's report, under the heading "History of Present Illnesses,"
4   discusses a summary of plaintiff's medical history.  Id.  As a result, it appears that Dr. Vesali was
5   informed generally of plaintiff's medical history at the time of the examination.  Additionally, a
6   "nonexamining physician['s] assessment[] may properly support a decision when other
7   independent evidence supports those assessments."  Morgan v. Apfel, 169 F.3d 595, 600 (9th Cir.
8   1999).  Here, both Dr. Vesali and Dr. Ghaemian's opinions that plaintiff was malingering were
9   supported by the opinion of Dr. Xia, who repeatedly diagnosed plaintiff with fictitious /
10  malingering disorder.  Lastly, Drs. Vesali and Ghaemian's opinions that plaintiff was malingering
11  were based on their independent clinical observations of plaintiff, which does not require review
12  of a medical record and which can constitute substantial evidence.  See Sprague v. Bowen, 812
13  F.2d 1226, 1232 (9th Cir. 1987) (opinion based on clinical observations supporting psychiatric
14  diagnosis is competent evidence).  See also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.
15  2001).

16         Plaintiff also argues that the ALJ failed to order plaintiff to undergo a neurological
17  examination to rule out malingering, as recommended by Dr. Ghaemian.  Generally, an ALJ has a
18  duty to fully and fairly develop the record.  Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).
19  However, this duty is only triggered "when there is ambiguous evidence or when the record is
20  inadequate to allow for proper evaluation of the evidence."  Mayes v. Massanari, 276 F.3d 453,
21  459-60 (9th Cir. 2001).  Here, three different medical professionals, including plaintiff's treating
22  physician, made note of malingering.  There does not appear to be any ambiguity based on this
23  evidence.

24         With regard to Dr. Ghaemian's assessment that plaintiff was limited in his capacity to
25  interact with colleagues and society because of his irritability and anger issues, the ALJ gave little
26  weight to this opinion after noting plaintiff's extensive socialization with family and friends, his
27  continuous interactions with his ex-wife's children, his ability to obtain physical and mental
28  health care treatment, and his ability to locate an attorney to assist him with his daughter's death.

14

The ALJ did, however, give substantial weight to Dr. Ghaemian's opinion regarding plaintiff's ability to tolerate stress or respond to changes and make sound decisions in a working environment.

The undersigned therefore finds that the ALJ's treatment of Dr. Ghaemian's opinion to be supported by substantial evidence.

### c. Records from Non-Examining Sources

Lastly, the ALJ considered the opinion of State Agency non-examining physician Dr. L. Mallare, who reviewed Dr. Ghaemian's report. AR 27, 283-93. Dr. Mallare determined that plaintiff's mental impairment is not severe, that he has a depressive disorder per meds, that he has a personality disorder not otherwise specified, and that he has a substance dependency problem. Dr. Mallare then assessed plaintiff's functional limitations as follows: mild limitations as to restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Dr. Mallare did not note any episodes of decompensation. This opinion supported the ALJ's finding.

### 2. Additional Evidence Submitted to Appeals Council

Plaintiff argues that the ALJ's conclusion was erroneous because he had only limited medical records before him. Specifically, the ALJ was missing medical records showing that plaintiff was treated on eleven occasions between November 23, 2009 and March 25, 2010 at APSS and on nine occasions at Sacramento County Primary Care Clinic ("Primary Care") between November 6, 2008 and May 27, 2010. While plaintiff did not produce these documents for the ALJ's consideration, he did submit them to the Appeals Council, which ultimately upheld the ALJ's ruling. Additional evidence submitted to the Appeals Council becomes a part of the administrative record which a reviewing court must consider when reviewing the Commissioner's final decision for substantial evidence. Brewes v. Comm'r of Social Sec. Admin., 682 F.3d 1157 (9th Cir. 2012).

Even upon consideration of the additional evidence, the undersigned finds that there exists substantial evidence in the record to support the Commissioner's final decision. This is because the additional records are merely duplicative of those that were presented to the ALJ. The

15

additional records from Primary Care, for example, which consist primarily of medication follow-up appointments, are merely duplicative of those records that were before the ALJ. These records reflect that plaintiff was suffering from depression related to his daughter's death, AR 356; that he wants answers regarding her death, AR 362; that he suffers guilt regarding her loss, AR 357, 358; that he was taking Prozac for his depression, AR 362; that he was doing better because the Prozac "helps me stay calm," AR 362, and "helps me cool out," AR 359; that his depression improved on Prozac, AR 359; that with the Prozac he was feeling less agitated and less hopeless, AR 357, 361; that he was not adhering to his medication schedule, AR 360; that he smoked marijuana twice a week because it "calms me down," AR 362; that his mood is "lightly dysphoric, irritable . . . angry when discussing daughter's murder," AR 362; but his thought process is mostly linear, logical, AR 362; that he has no "command hallucinations," AR 362; and that he enjoys spending time with grandchildren and going fishing, AR 361.

Similarly, the additional records from Dr. Xia mirror those that the ALJ already considered. These records indicate that plaintiff's cognition is "grossly normal," AR 395; his thought process is linear, AR 395; he is "doing so-so," AR 404; the medication seems to be working "ok" and "pretty well" on his mood, AR 404, 408, 410; plaintiff thinks the medication is helpful, AR 408; the medication helps reduce his anger, AR 410; he takes medication with marijuana because "[i]t makes you hopeful and not thinks [sic] about hurt [sic] anybody," AR 408; he takes the medication intermittently "as needed," AR 378; he feels hopeless, AR 378, 395; but he also denies hopelessness, AR 404, 408, 410; he is described as calm, AR 408, 410, as angry, AR 404, as sad and tearful, AR 388, and as irritable and depressed, AR 378; he "looks angry with an attitude," AR 395, 398; he desires to take revenge on the person who harmed his daughter, AR 410; he thinks his daughter is controlling his actions, AR 388, and he is not delusional, AR 378. In each of these reports, Dr. Xia's assessment was "Mood d/o NOS Mood D/O due to GMC or medication, abnormal grieving, dysthymia, bipolar, and factitious/malingering d/o."

Lastly, the additional progress notes from Ms. Murai also duplicate the progress notes that were before the ALJ, both from Ms. Murai and Ms. Vayder. These notes reflect that plaintiff is

16

depressed about new details regarding his daughter's death, AR 382; he is focused on justice being served, AR 386; his mood is "depressed and mildly irritable," AR 380; but Prozac helps his mood, AR 385, 386; he is doing "alright" and is staying out of trouble, AR 380; he continues to feel overwhelmed with grief and anger regarding his daughter's death, AR 382; but he also feels more hopeful, AR 383; his physical pain "definitely" contributes to his mood as far as depression and irritability, AR 387; he has a difficult time being around people, AR 382; but he visits with people and friends who support him, AR 380, 383, 389, 391; he has been helping his brother purchase new clothes, AR 380; during the holidays, he spent time at his brother's house but did not join anyone for Christmas dinner, AR 385; he planned on and then went fishing with his friend, AR 386, 387; and he is staying with friends, AR 386, 392.

As none of these records are materially different from those considered by the ALJ, and because the court has already found that substantial evidence exists to support the Commissioner's decision, that decision must be upheld. In so holding, the court rejects plaintiff's argument that the Appeals Council erred when it did not remand the case to the ALJ upon receipt of the new evidence. This holding also resolves plaintiff's argument that the ALJ erred in not considering his depression at step three of the sequential evaluation process.[3]

## CONCLUSION

Because the undersigned finds no error in the ALJ's reasoning and analysis, IT IS ORDERED that:

1. Plaintiff's motion for summary judgment is denied; and
2. The Commissioner's cross-motion for summary judgment is granted.

////

////

////

---

[3] Plaintiff alleges that he qualifies for the Listed Impairment of Listing 12.04 for Affective Disorders and that the ALJ failed to evaluate properly this issue. However, since the ALJ's finding that plaintiff did not meet the less rigorous, de minimis screening step, there was no error in not proceeding to the third step of the analysis as to plaintiff's mental health impairment.

3. The Clerk is directed to enter judgment in defendant's favor.

DATED: September 18, 2013

*[signature: Allison Claire]*
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/mb;cren0097.ss